UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Nos.   21 CR 50064 |
| v. | ) | |
| | ) | Judge Iain D. Johnston |
| BRANDON SIMONSON | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

On March 2, 2020, the defendant, Brandon Simonson, a.k.a. Whitey, and Kristopher Martin ("Martin") punched, kicked, and stomped 31-year-old Matthew Phillips, a fellow inmate, in a recreational area at the USP Thomson. As a result of the brutal attack, Phillips died three days later in a hospital bed just 18 months before he was scheduled to the released from prison.[1] Why did the defendant commit this violent and senseless murder? Because Matthew Phillips was Jewish. The jury recognized this and convicted defendant of second-degree murder, conspiracy to commit murder, hate crime and assault resulting in serious bodily injury.

By statute and under the federal sentencing guidelines defendant is eligible for a life sentence. As further explained below, and in accordance with the statutory penalties and federal sentencing guidelines, a sentence of life imprisonment is the appropriate sentence for this defendant.

---

[1] Matthew Phillips' calculated expected release date was September 6, 2021.

I.  **OFFENSE CONDUCT**[2]

On March 2, 2020, Matthew Phillips, an inmate at Thompson ISP, entered recreation cage 5. Shortly afterward, defendant, a prospective member of VBS, Valhalla Bound Skinheads, a prison gang whose ethos include strict white supremacist views, the promotion of an all-white race, and endorse Nazism, entered the same recreation cage, knowingly in advance that he was going to attack Phillips because he was Jewish.

Defendant prepared to attack Phillips by first taking off his jacket, hanging it up, and looking back over his shoulder at Phillips. Defendant then quickly walked over to Phillips, whose hands were deeply thrust into his pockets and who was unaware of what was about to happen. Defendant came at the victim with fury, rage, and viciousness; the force of defendant's punches knocked Phillips off his feet. The force of one blow to Phillips' jaw caused Phillips to fall backwards, his head striking the concrete.

Even though Phillips lay unconscious, defendant and Martin kept beating Phillips, administering blow after blow to Phillips' head, which thrashed from side to side after bouncing off the concrete. Defendant continued to pummel Phillips despite Phillips's apparent poor condition: he was unconscious, seizing, and abnormally contorting. After repeatedly punching Phillips, defendant stomped and kicked the right side of his head, furthering the irrevocable damage.

---

[2] The facts set forth in this section and throughout the Sentencing Memorandum are based on the evidence presented at trial, the government's version of the offense and the accompanying exhibits, and the information contained in the Presentence Investigation Report ("PSR").

2

Following the beating, all inmates in the immediate area were ordered to the ground, after OC spray was administered. When called by corrections officers, defendant popped up to his feet with confidence and swagger. Defendant smiled as he was escorted to a shower cell; he flexed his muscles at the other inmates through the shower door, he proudly yelled gang chats of "Oi Oi." He also flexed his bicep muscle through the shower cell window as he gazed upon Phillips' bloodied, broken, and dying body being pushed on a gurney in front of him.

Phillips' injuries were horrific. Moments after the assault, when he regained some consciousness, a disoriented Phillips called out, asking "why" and stating, "my head hurts." Images of Phillips' brain showed immense swelling, a large subdural hematoma, hemorrhaging throughout the brain, skull fractures and that his brain had shifted from one hemisphere to the other. On March 5, 2020, despite extraordinary medical efforts including two surgeries, Matthew Phillips was declared brain dead, the machinery keeping him alive was disconnected, and he died on a hospital bed in Iowa City.

Following the attack, defendant showed no remorse for his acts. The next day, on March 3, 2020, defendant told Martin that he might have hit Phillips' too hard, as his foot swelled and he sought medical attention. In April 2020, when FBI agents went to the SMU to interview inmates, defendant yelled, "The FBI is here, nobody goes out." In November 2021, correctional officers attempted to serve a federal search warrant on defendant to photograph defendant's tattoos. Instead of complying, defendant forcefully pulled away from the officers and attempted to go back into his

3

cell. Correctional officers were forced to take defendant to the ground because of his disruptive and dangerous behavior. Eventually, photographs of defendant's tattoos showed his continued allegiance and membership in the VBS gang, as evidenced by the completion of his VBS "tri-fot" tattoo.

After the murder, in May 2020, the leader of VBS rewarded defendant for throwing a "boot party for Mr. Kike," meaning assaulting and ultimately killing Phillips, by naming defendant "Comrade of the Month" and eliciting support from other VBS members for defendant. Despite being convicted of the charges in this case, defendant's membership in VBS remains active today. PSR ¶ 148.

Furthermore, defendant's efforts to avoid accountability for his crimes continued through his trial. As further detailed below, and in the government's official version, defendant lied about his true motive for these crimes. He repeatedly and falsely denied that he assaulted Phillips due to his race and religion, despite the physical and testimonial evidence to the contrary. The jury rightfully rejected these lies based upon the overwhelming evidence, including Martin's testimony, other inmate testimony, the video evidence, defendant's actions and statements after the assault, the loads of anti-sematic propaganda found in defendant's cell, articles authored by defendant in the Road To Valhalla ("RTV"), the official newsletter of VBS which promoted anti-semantic views, and defendant's swastika and SS bolt tattoos.

## II. GUIDELINES CALCULATIONS

The government previously filed objections to the guideline calculations, namely, that the second-degree guideline (§ 2A1.2) should be cross-referenced by the

4

Court, not the first-degree murder guideline (§ 2A1.1). R. 354. The government has no further objections to the guidelines calculations as set forth in the PSR. Therefore, using Guideline § 2A1.2, criminal history category VI, and the career offender guideline, defendant's guidelines range is life imprisonment.

> 1. ***Additional Support for the Obstruction of Administration of Justice Enhancement § 3C1.1***

Guideline § 3C1.1, application note 4, provides examples of conduct by the obstruction guideline, including "(B) committing, suborning, or attempting to suborn perjury…if such perjury pertain to conduct that forms the basis of the offense of conviction"; "(C) producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding; . . . (F) providing materially false information to a judge or magistrate judge." This enhancement is properly applied only when a defendant gives "false testimony under oath or affirmation concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. DeLeon*, 603 F.3d 397, 403 (7th Cir. 2010).

As part of defendant's case-in-chief, defendant testified in his own defense. In doing so, he swore under oath to tell the truth. Defendant discarded that obligation and instead lied about his motive for the attack, saying it was because of an alleged drug debt and not because defendant was Jewish. Defendant's testimony was both illogical and blatantly false. First, the alleged drug debt was a non-sensical reason for the attack; the alleged drug debt was incurred at another prison, was owed to another, non-VBS member, and did not involve defendant or Martin.

5

Moreover, defendant's testimony was directly contradicted by Martin and other inmates. Martin testified that defendant told him in their shared cell, just moments before the attack, that they were going to "get the f***ing Jew," or words to that effect. Martin further testified that the attack on Phillips was not driven by a drug debt, but rather was ordered by VBS leadership and was designed to initiate him into VBS. Further, Phillips' cell mate testified that at the time of the murder, Phillips did not owe a drug debt; had there been one, he would have paid it for Phillips. Other inmates testified consistently regarding the lack of drug debt. Finally, toxicology results showed Phillips had no drugs in his system when he was admitted to the hospital on March 2, 2020. None of the evidence at trial supported defendant's assertions that he attacked Phillips over a drug debt.

Defendant's lies were material, too. An element of the hate crime statute requires that the crime was committed because of the victim's perceived race or religion. Defendant's false testimony regarding the drug debt reflected a willful intent to hide the truth about his actual motive for attacking and ultimately killing Phillips: he attacked and brutally beat Phillips because he was Jewish. As such, the obstruction enhancement under § 3C1.1 applies.

### III. SENTENCING RECOMMENDATION

Title 18, United States Code, Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary", to comply with the purposes of sentencing. 18 U.S.C. § 3553(a). Specifically, the Court must impose a sentence that is sufficient but not greater than necessary "(A) to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D). In determining an appropriate sentence, the Court must consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant, the defendant's Sentencing Guideline range, and the Sentencing Commission's policy statements. 18 U.S.C. § 3553(a)(1), (4), (5). The Sentencing Guidelines are only advisory, but "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

Defendant has a long history of drug use, drug trafficking, and violence, culminating recently with the most serious offenses he has committed: conspiring to murder, and murdering, Matthew Phillip because of his religious affiliation. Defendant's offense level, criminal history category, and guidelines are all the highest that can be assigned under the sentencing guidelines—and for good reason. Defendant has repeatedly showed that he will not abide by the rule of law no matter whether he is a free citizen or incarcerated. Further, defendant's lack of remorse and perjury at trial reflects poorly on his rehabilitative potential. Considering the § 3553(a) sentencing factors, which are further discussed below, the only sentence

7

that is sufficient in this case to comply with the purposes of sentencing is life imprisonment.

### A. Seriousness of the Offense

The seriousness of defendant's crimes cannot be overstated. Defendant's actions deprived Phillips of his life and caused Phillips' family immeasurable pain and suffering. The Phillips' family lost a son, a brother, a nephew, an uncle, and a friend forever.

In addition, many aggravating factors take this case outside of the heartland of second-degree murder cases. After conspiring to do so, defendant and Martin assaulted and murdered Matthew Phillips with their bare hands. They brutally punched and kicked Phillips in the head 34 times, and with great force; defendant stomped on Phillips' head so hard that he bruised his own foot and crushed Phillips' skull. The defendants did not slow down or stop although Phillips laid defenseless and unconscious on the concrete ground. And the resulting injuries and trauma to the victim's brain were horrific. Even though the victim was initially knocked unconscious, the pain and suffering the victim must have felt after regaining consciousness, and the physical and emotional suffering he and his family endured during his hospital stay, cannot be underestimated or forgotten.

Moreover, defendant's actions after the murder were chilling, and further demonstrate the seriousness of these offenses. Defendant's actions showed that he was not fazed in the least by what he had done; rather, he was elated and proud.

Finally, defendant's motive makes his crime especially egregious and intolerable. Defendant murdered Phillips in front of his fellow inmates, correctional officers, in an open recreation yard that was visibly recorded. Defendant's brazen conduct shows that he wanted to communicate to one and all that he would not "rec with a Jew," that Jewish people deserve this type of abuse, and that prison authorities are powerless to stop it. Thus, the impact of defendant's crime extended to encouraging others to engage in similar violence, intimidating other members of the Jewish community, as well as members of other minority communities, and threatening the safety and security of BOP staff members and other inmates.

A life sentence is warranted to reflect the seriousness of defendant's crimes.

**B.     Defendant's History and Characteristics**

Defendant has a lengthy criminal history, dating back to his teen years, including several drug, theft, firearm, and domestic violence related convictions. PSR ¶¶ 101, 102, 104-107, 110, 112, 114-117. Over time, defendant racked up 21 criminal history points and has been incarcerated most of his adult life. As noted in the PSR, defendant is a career offender, and that description aptly fits defendant. Although most of defendant's documented criminal history is in large part drug-related, defendant violated his probation and supervised release conditions multiple times, reflecting defendant's disrespect of the law. PSR ¶¶ 101, 102, 104, 117. Defendant committed the instant office while he was serving a sentence for conspiracy to distribute methamphetamine, a crime he committed only one month after he was released on supervised release for another drug offense. PSR ¶ ¶ 114, 117.

9

However, most troubling and telling is what defendant has done while confined in prison. Defendant has shown escalating lawlessness and violence while in custody. Even in a contained environment like prison, he has incurred numerous disciplinary infractions and has committed four assaults on other inmates, three before the murder and one while detained on the instant offense. PSR ¶ 117 (pg. 33). It is because of these disciplinary violations that defendant was transferred to the BOP's Special Management Unit, ("SMU") at USP Thomson, "where enhanced management is necessary to ensure the safety, security, or orderly operation of Bureau facilities, or protection of the public." *See* BOP Program Statement 5217.02. In the SMU, defendant was confined to his cell most of the day with at least 5 hours of recreational time per week, ordinarily in one-hour periods on different days. It was within this short amount of recreational time that defendant committed the instant offenses, proving once again that defendant presents security and management concerns over and above BOP's most restrictive federal programs.

Moreover, just last year, while awaiting trial in this case, defendant attacked another inmate at the Winnebago County Jail and again continued assaulting the inmate despite being given commands to stop. PSR ¶ 126. Defendant characterized this attack as "physical altercation" (PSR ¶ 168) and claimed that it happened because he was off his medications; however, the only medications he was prescribed are for back pain, allergies, pain, and anxiety, not the type of medication likely to prevent a violent, aggressive attack on the other inmate, if taken as prescribed. *See*

PSR ¶ 165. Defendant's history and characteristics suggest that defendant has no intention of conforming his conduct to the laws of our society.

## C. Protecting the Public and Affording Adequate Deterrence

There is a strong need to protect the public from defendant. Defendant's violent behavior in this case, lack of remorse, criminal history and characteristics, failure to take responsibility for his crimes, continued crimes while incarcerated, and lack of self-reform are criteria that show defendant poses a high risk of recidivism and a serious threat to those around him. For these reasons, a life sentence is warranted to justly punish him for his crime, protect the public from defendant in the future, and provide adequate deterrence to others—particularly those in prison, who might be considering engaging in similar acts.

The government agrees that there is some mitigation that the Court can and should take into consideration in determining an appropriate sentence. To begin, defendant had an unstable, chaotic, and traumatic childhood, and both his parents abused narcotics and alcohol. PSR ¶¶ 133, 135,136, 138, 142, 153. Defendant also reported that he was verbally and physically abused by his mother and father (PSR ¶¶ 141) and witnessed domestic violence against his mother. PSR ¶ 133, 135. According to defendant, he started abusing drugs at an extremely early age and that he continued abusing drugs even while incarcerated. PSR ¶¶ 176-184. Defendant has been diagnosed with amphetamine and cannabis dependance. PSR ¶¶ 186, 187. Defendant did not complete high school; according to school records, he appears to have dropped out after his freshman year. PSR ¶ 194. Family members generally

corroborated defendant's description of the deprivation and trauma he suffered in his youth and beyond. PSR ¶¶ 136, 142, 144, 153.

Despite his lack of schooling, defendant managed to earn his GED while incarcerated. PSR ¶ 195. And defendant has completed other course work in the BOP, and states that he is open to furthering his education and attending other BOP programming geared towards addressing his drug addiction and mental health issues. PSR ¶¶ 190, 197-200.

Nevertheless, none of these factors—individually or collectively—warrants a significant departure from the applicable guideline range. Defendant's lack of judgment and impulse control, and addiction to violence, make him an unpredictable and dangerous person who poses a danger to society. Defendant's actions in this case were egregious and show that he is capable of inflicting serious harm and death under even the strictest of constraints. Importantly, defendant has not accepted responsibility for his crimes and the harm they caused. Instead, he has minimized his conduct and lied to cover up his true motives. Notably, when asked by the probation officer what he would change if given the opportunity to change *anything*, defendant responded that he would change "his prior drug use," "his exposure to that lifestyle" and "his prison experience," and made no mention of his having taken Matthew Phillips' life. PSR ¶ 154.

In sum, the aggravating nature and circumstances of the instant offense and history and characteristics of defendant far outweigh the mitigation presented. A life

12

sentence is warranted to reflect the seriousness of defendant's offenses, provide just punishment, protect the public and afford adequate deterrence.

## CONCLUSION

For the reasons explained above, the government respectfully requests that the Court impose a sentence of life imprisonment to be served consecutively to the sentence imposed in United States District Court of Minnesota case no. 14CR378-8.

        Respectfully submitted,

        ANDREW S. BOUTROS
        United States Attorney

BY:  /s/ *Vincenza Tomlinson*
        VINCENZA TOMLINSON
        RONALD DEWALD
        Assistant United States Attorneys
        327 South Church Street, Suite 3300
        Rockford, Illinois 61101
        (815) 987-4444
        Vincenza.tomlinson@usdoj.gov

## CERTIFICATE OF SERVICE

I, VINCENZA TOMLINSON, hereby certify that, on August 15, 2025, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, N.D. Ill. Local Rule 5.5, and the General Order on Electronic Case Filing (ECF), the following document

**UNITED STATES' SENTENCING MEMORANDUM**

was served pursuant to the district court's ECF system as to all ECF filers.

Respectfully submitted,

By: /s/ *Vincenza Tomlinson*
VINCENZA TOMLINSON
RONALD DEWALD
Assistant United States Attorneys
327 South Church Street, Suite 3300
Rockford, Illinois 61101
(815) 987-4451